UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

CASE NO. _____

TREVON BURTON, as Personal Representative
for the Estate of Ronald Fitch, deceased,

       Plaintiff,

v.

CARNIVAL CORPORATION,
CRUISE SHIP EXCURSIONS INC., and
XYZ CORPORATION(S),

       Defendants.
_____/

TREVON BURTON, as Personal Representative
for the Estate of Ronald Fitch, deceased,

       Garnishor,

v.

CARNIVAL CORPORATION,
NCL (BAHAMAS) LTD.
ROYAL CARIBBEAN CRUISES LTD. d/b/a
ROYAL CARIBBEAN GROUP, and
CELEBRITY CRUISES INC.,

       Garnishees.
_____/

## COMPLAINT FOR DAMAGES AND JURY TRIAL DEMAND WITH ALTERNATIVE PRAYER FOR ATTACHMENT PURSUANT TO SUPPLEMENTAL RULE B

The Plaintiff sues Defendants and alleges:

### PRELIMINARY ALLEGATIONS

1.  The Plaintiff, TREVON BURTON, is a U.S. citizen and citizen and resident of the

State of Indiana.  The Plaintiff brings this action in his capacity as Personal Representative for the

Estate of Ronald Fitch, deceased (hereinafter the "Decedent"), who, when alive, was also a U.S. citizen and resident of the State of Indiana.

2.   Plaintiff also brings this action to recover damages for himself individually, as he was the Decedent's grandson; and for and on behalf of the Decedent's beneficiaries, survivors and/or lineal descendants, including but not limited to: Cynthia Hills (life-long partner); Trevon Burton (grandson); Heather Burton (granddaughter-in-law); K.B. (great granddaughter, a minor); and L.B. (great granddaughter, a minor). The individuals identified in this paragraph constitute a close-knit family, as they visited each other regularly, spent holidays with each other, spent vacations with each other, shared wisdom and life experiences with each other, and loved each other as a close-knit nuclear family.

3.   Defendant, CARNIVAL CORP. (hereinafter "Carnival"), is a corporation incorporated under the laws of Panama having its principal place of business in Miami, Florida.

4.   Defendant, CRUISE SHIP EXCURSIONS INC., upon information and belief, is a corporation incorporated in the U.S. Virgin Islands.

5.   Defendant(s), XYZ CORPORATION(S), is included to represent the owner(s) and/or operator(s) of the subject excursion upon which the Decedent died, insofar as such entity(ies) has(have) a different name than the name included herein (i.e., CRUISE SHIP EXCURSIONS INC.). In the event discovery reveals different and/or additional entities contributed to the ownership, operation, and/or management of the subject excursion, the legal names of those entities will be substituted for XYZ CORPORATION(S). Defendants, CRUISE SHIP EXCURSIONS INC. and XYZ CORPORATION(S) are hereinafter collectively referred to as the "Excursion Entities" in a manner so as to retain each Defendant's separate and individual liability in the event said Defendants are severed.

6.   Plaintiff's Complaint is brought under the Court's diversity jurisdiction, as the parties are completely diverse and the matter in controversy exceeds, exclusive of interest and costs, the sum specified by 28 U.S.C. § 1332.  As a result, Plaintiff demands a jury trial on all claims asserted herein. In the alternative, if diversity jurisdiction does not apply, then this matter falls under the admiralty and maritime jurisdiction of this Court.

7.   The causes of action asserted in this Complaint arise under the General Maritime Law of the United States, laws of the U.S. Virgin Islands, and state law, where there is no conflict with General Maritime Law.

8.   Further, given that U.S. General Maritime Law applies to the causes of action asserted herein, Plaintiff invokes joint and several liability against the Defendants named herein.

9.   Defendants, at all times material hereto, personally or through an agent:

   a.   Operated, conducted, engaged in or carried on a joint business venture in this state and/or county or had an office or agency in this state and/or county;

   b.   Were engaged in substantial business activity within this state;

   c.   Operated vessels in the waters of this state;

   d.   Committed one or more of the acts stated in Florida Statutes, Sections 48.081, 48.181 or 48.193;

   e.   The acts of Defendants set out in this Complaint occurred in whole or in part in this county and/or state.

   f.   Defendants were engaged in the business of providing to the public and to the Plaintiff in particular, for compensation, vacation cruises aboard their vessel.

10.   Defendants are subject to the jurisdiction of the Courts of this state.

**The Excursion Entities' activities in Florida with Carnival constitute a Florida-based joint venture and satisfy a finding of specific jurisdiction under Florida Statute § 48.193(1)(a)(1).**

11.   At all times material hereto, the activities of Carnival and the Excursion Entities in Florida constitute a Florida based joint venture and satisfy the specific jurisdiction provision of Florida Statute § 48.193(1)(a)(1), by acts that include, but are not limited to, (a) reaching out to

Florida-based cruise lines, insurers, cruise industry associates, and/or premium financing companies for purposes of operating, conducting, engaging in, and/or carrying on a business and/or business venture in this state; (b) contractually agreeing to indemnify Florida-based cruise lines (entities mostly located in Miami and Fort Lauderdale) for any harm resulting to cruise passengers, thereby insuring a "person, property, or risk located within this state."; and/or (c) establishing a joint business venture with Carnival, which joint venture was based in Miami, Florida, U.S.A., to own, manage, fund, sponsor, advertise, market and/or operate the subject excursion.

**The Excursion Entities' contract with Carnival meets all requirements to
satisfy a finding of specific jurisdiction under Florida Statute § 48.193(1)(a)(9).**

12. At all times material hereto, the Excursion Entities entered into a contract with Carnival concerning the subject excursion, which (a) contains a choice-of-law clause designating Florida law as the governing law; (b) contains a provision whereby the Excursion Entities agree to submit to the exclusive jurisdiction of the courts of Florida; (c) involves consideration of not less than $250,000 or relate to an obligation arising out of a transaction involving in the aggregate not less than $250,000; (d) does not violate the U.S. Constitution; and (e) has at least one party of the contract that is a resident of Florida or incorporated under the laws of Florida.  Therefore, the contract between Carnival and the Excursion Entities meets all requirements to satisfy a finding of specific jurisdiction under Florida Statute § 48.193(1)(a)(9).

**The Excursion Entities' continuous and systematic general business contacts with
Florida satisfy a finding of general jurisdiction under Florida Statute § 48.193(2).**

13. At all times material hereto, the Excursion Entities have engaged in substantial and not isolated activity within this state, including, but not limited to: (a) reaching out to cruise lines in Florida and establishing long-term partnerships with them; (b) deriving a substantial portion of their revenues from their business with Florida-based cruise lines; (c) periodically traveling to Miami to meet with cruise line executives for purposes of maintaining the business relationships

and/or obtaining new business; (d) procuring insurance through companies in Florida; (e) maintaining Florida entities as "Agents of Record" for insurance purposes; (f) agreeing to insure and indemnify entities in Florida; (g) signing premium financing agreements with Florida entities in order to obtain a loan to pay for liability insurance premiums; (h) buying parts and/or supplies from Florida-based suppliers to operate their excursions; (i) signing powers of attorney and/or appointing attorneys-in-fact in Florida to carry out their Florida operations; (j) participating in cruise industry trade shows in Miami (e.g., Sea trade); and/or (k) maintaining active membership in Florida Caribbean Cruise Association, based in Florida.

14. At all times material hereto, the Excursion Entities have been in the business of providing excursions to cruise line passengers in U.S.V.I. through Florida-based cruise lines, including Carnival, Royal Caribbean, Celebrity and/or NCL. In entering into contracts with these Florida-based cruise lines, the Excursion Entities agree to the exclusive jurisdiction of courts in Florida. Additionally, by being under contract with the Florida-based cruise lines, the Excursion Entities receive the benefit of the cruise lines' advertising and promotional efforts.

15. At all times material hereto, the Excursion Entities' arrangement with the Florida-based cruise lines and the circumstances of this case are markedly different than those at issue in *Daimler AG v. Bauman*, 134 S. Ct. 746 (2014). Herein, unlike *Daimler*, the Plaintiff is suing a Florida-based cruise line (Carnival) for injuries sustained while participating in an excursion operated by agents of the cruise line (the Excursion Entities) -- agents set up almost exclusively to do business with cruise lines (a majority of which are based in Florida). Further unlike *Daimler*, Carnival is "at home" in this jurisdiction because Carnival maintains its principal place of business in Florida. Thus, under *Daimler*, the Excursion Entities are also deemed "at home" in this jurisdiction by their direct and indirect contacts with Florida (through the Florida-based cruise lines).

## <u>The Excursion Entities' activities in Florida satisfy</u><br><u>a finding of jurisdiction under Fed. R. Civ. P. 4(k).</u>

16. In the alternative, the Excursion Entities are also subject to jurisdiction pursuant to Federal Rule of Civil Procedure 4(k)(2) because (a) the instant maritime tort claims arise under federal law; (b) the Excursion Entities are not subject to jurisdiction in any state's courts of general jurisdiction; and (c) exercising jurisdiction over the Excursion Entities is consistent with the United States Constitution and laws based on the Excursion Entities' minimum contacts with the United States as a whole such that the maintenance of this lawsuit does not offend traditional notions of fair play and substantial justice.  These minimum contacts are set forth in the above allegations, and include, but are not limited to, the Excursion Entities' location and operation in the United States, as well as marketing, promoting, and selling tickets for its excursions in the United States directly and/or through cruise lines as their agents located all over the United States.

17. Defendant Carnival requires that Plaintiff's claims must be brought in this Court, to the exclusion of all other courts that may otherwise also have subject matter and personal jurisdiction. However, given the facts of this case Plaintiff could have also brought this action in Federal Court for the U.S. Virgin Islands. If this Court declares that Plaintiff does not have personal jurisdiction over one or more of the Defendants, Plaintiff respectfully requests that the Court consider transfer of this matter to the U.S. Virgin Islands Federal Court. Plaintiff has not filed a holding action in a U.S. Virgin Island court so as to preserve judicial economy/resources. However, Plaintiff timely files this action in this Court to preserve the applicable statute of limitation for all potential claims against all potential Defendants.

## FACTS COMMON TO ALL COUNTS

18. At all times material hereto, Carnival owned, operated, managed, maintained and/or controlled the vessel, *Carnival Celebration*.

19. At all times material hereto, the Excursion Entities owned and/or operated the subject excursion, which was entitled "St. John Champagne Catamaran Sailaway" (herein after referred to as "the subject excursion"); and the subject excursion was offered, arranged for, sponsored, recommended, marketed, sold, co-owned, co-operated and/or managed by Carnival.

20. On February 16, 2023, the Decedent was a paying passenger aboard the *Carnival Celebration*, which vessel Carnival operated in navigable waters.

21. On February 16, 2023, the Decedent participated in the subject excursion, and as a result thereof, died.

22. On February 16, 2023, Plaintiff, Heather Burton, K.B., L.B. and Cynthia Hills also participated in the subject excursion, were subject to the same dangerous conditions which caused the Decedent's death, were thus within the zone of danger that killed the Decedent; and also witnessed the Decedent's death.

### Promotional Material and Statements Concerning
### Shore Excursions Generally and the Subject Excursion Specifically

23. First, after booking the subject cruise, Carnival sent Plaintiff and the Decedent promotional material, which provided information and descriptions of shore excursions, including the subject excursion.

24. Second, after booking the cruise, Plaintiff's family reviewed Carnival's website on which Carnival offered, marketed, promoted and advertised the shore excursions it offered for the subject cruise, including the subject excursion.

25. For the subject excursion, Carnival posted the following on its website on October 20, 2022, which is the date that the Decedent, Plaintiff, and Plaintiff's family reviewed Carnival's

website, the subject excursion and made the collective decision to purchase and partake the subject excursion:



26. Notably, Carnival represented the following about the subject excursion:

    a.   "Easy activity level"

    b.   The minimum age for participation in the excursion was "4 years old"

    c.   "Snorkel gear and instructions included"

27. Based upon Carnival's website representations about the subject excursion, which all members of Plaintiff's family reviewed on or about October 20, 2022 prior to purchasing the excursion and justifiably relied upon same given Carnival's promotion, Plaintiff's family, including the Decedent, decided to purchase the excursion and participate on same during the subject cruise.

28. Notably, on or about October 20, 2022, Carnival <u>did not</u> warn Plaintiff's family about the following concerning the subject excursion:

    a.   The activity for the subject excursion was actually moderate, instead of easy; and on or about March 21, 2023 – after the subject incident that caused the Decedent's death – Carnival changed the activity level description to "moderate".

    b.   The minimum age for participation in the excursion was 6 years old; and on or about March 21, 2023 – after the subject incident that caused the Decedent's death – Carnival changed the minimum age for participation in the excursion as 6 years old.[1]

    c.   That participants with heart conditions were not permitted to partake in the excursion; and on or about March 21, 2023 – after the subject incident that caused the Decedent's death – Carnival changed the description for the subject excursion to prohibit participate by individuals with heart conditions.

    d.   The water current in the subject area for the subject excursion would be unreasonably difficult and/or dangerously strong.

---

[1] In fact, L.B. was 4 years old at the time of the subject incident, and given her age, Plaintiff's family was unable to book any excursion on Carnival's website for which participants needed to be older than 4 years old. In other words, Carnival's website automatically monitored Plaintiff's family's online activity, and automatically precluded them when they tried to book an excursion for which participants needed to be older than 4 years of age.

29. Both Carnival and the Excursion Entities are responsible for the contents of the shore excursion description excerpted above. This is because, before advertising and marketing the subject shore excursion to Carnival's passengers on Carnival's website, Carnival requires that the Excursion Entities provide Carnival with a draft description of the subject excursion, and Carnival uses the written feedback it gets from the Excursion Entities to describe the subject shore excursion to Carnival's passengers. Thus, both Carnival and the Excursion Entities are responsible for the contents of the subject shore excursion description excerpted above; which Carnival broadcasts and publishes on its website from Carnival's servers located at Carnival's principal place of business in Miami, Florida.

30. Third, Carnival also had promotional materials at its shore excursion desk aboard the cruise ship and/or other areas of the ship with information and descriptions of shore excursions, including the subject excursion. Tickets for shore excursions, including the subject excursion, were also available for sale on Carnival's shore excursion desk aboard the cruise ship.

31. Fourth, the information and/or material Carnival made available and/or distributed to the Plaintiff and the Decedent represented that the excursions, including the subject excursion, were operated and/or overseen by Carnival and/or they were safe.  For example:

    a. Carnival's website publicly described the shore excursions in proprietary language, including, but not limited to, "our excursions."  Similarly, page 2 of Carnival's shore excursion brochure also used proprietary language referring to shore excursion as "our excursions" and directing passengers to "our experts at the Shore Excursion Desk by the main lobby."

    b. Carnival represented in its website that it "take[s] care of all the details and wait[s] for all Carnival excursions to return before departing."

    c. Carnival's website stated that Carnival "hand selected the best local providers at every port of call," and Carnival recommended that passengers not engage in excursions, tours or activities that were not sold through Carnival.  Additionally, page 2 of Carnival's shore excursion brochure stated that Carnival "constantly upgrades the shore excursion packages offered in each port of call in order to make sure the best possible selections are made available."

d. Carnival represented in its promotional material (including its website) that its excursion providers are "reliable [and] reputable," that all shore excursions were "guided," and that Carnival selects its excursion providers because they have the "best reputation" in their respective ports.

e. Carnival's website stated that passengers should book the excursions sold through Carnival because the providers are "required to carry insurance," without providing any details as to the adequacy or limits of such insurance.

32. For example, the photographs below depict the promotional material and information referenced herein, which were made available on Carnival's website on or about October 20, 2022:

**Carnival's Shore Excursions Homepage**
**(https://www.carnival.com/shore-excursions)**



**Carnival's Shore Excursion FAQs**
**(https://help.carnival.com/app/answers/detail/a_id/2866/~/shore-excursion-faqs)**

**When can I book shore excursions?**
Shore excursions may be booked online prior to sailing up until the Pre-Sail cut-off time, 11:30pm ET the evening prior to the cruise departure. Excursions for 2018 sail dates are available for purchase. For 2019 sail dates, please check back in late Spring of 2018.

After the online Pre-Sail, the remaining inventory will be available on the departure day onboard the ship. Due to availability, it is strongly suggested that guests take advantage of ordering their shore excursions in advance, online, in order to avoid disappointment once on board.

To browse our shore excursions click here.

**Do I have to book a shore excursion through Carnival or can I go off on my own?**
You are not obligated to book shore excursions through Carnival in order to leave the ship. Public transportation is available at each port. We suggest you visit your local library, bookstore or a pertinent website to determine where you would like to go.

Carnival does not offer any alternatives from the established shore excursion program. All shore excursions sold through Carnival are coordinated with reputable tour operators and include all of the most popular sites of interest.

One of the many benefits of booking excursions through Carnival is a guarantee that the ship will remain in port until all guests are back onboard. Carnival will not be aware of shore excursions that are booked independently. Also, keep in mind that some ports have visa requirements that may prevent you from venturing off on your own.

**Is it possible to go shopping and participate in an excursion while in port?**
Yes. Many of our excursions are only a few hours in duration, leaving you with plenty of time in most ports for shopping, sightseeing or even participating in another tour. Also, many of our longer excursions include a shopping stop.

**Why Book with Carnival for Shore Excursions?**
Reliable and Reputable. Yes, you have to take all of these into account, and we are happy to say that Carnival's shore excursion providers* are reliable, reputable, and required to carry insurance. Carnival has chosen the selected providers because these providers enjoy the best reputation in their respective ports. These shore excursion providers know that Carnival's guests expect a positive, fun-filled excursion.

**Are the shore excursions guided?**
Yes. All of the shore excursions sold through Carnival include an English-speaking guide except where otherwise noted in the tour description.

**What are the guidelines for writing tour reviews?**
We want to publish your review, so please:

▸ Keep your review focused on the shore excursion

▸ Refrain from mentioning competitors, prices, promotions or time sensitive details

▸ Do not include any personally identifiable information, such as full names

▸ Avoid writing about customer service; contact us instead if you have issues requiring immediate attention

▸ Reviews should be written by the guest who took the shore excursion.

▸ Please do not submit a review if you have not taken the shore excursion.

33. Among Carnival's promotional material concerning shore excursions, including the subject excursion, Carnival's website contained reviews for each excursion, which were posted by passengers. Notably, however, Carnival controls the information passengers disseminate about

the excursions.  For instance, as included in the above photograph, Carnival's website directs passengers to refrain from mentioning competitors, prices, and promotions, and to avoid writing about customer service issues related to the excursion.  Carnival also alters and/or deletes passengers' reviews that contain complaints and/or information concerning safety concerns and/or prior incidents that have occurred while participating in the excursion.  As a result, when passengers (like the Plaintiff and the Decedent) read the reviews on Carnival's website, they are under the impression that the excursion is safe because the vast majority (if not all) of the reviews Carnival chooses to leave on the website are positive, without any complaints about customer service, negative experiences and/or prior incidents.

34. Further, Carnival's promotional material and information did not contain adequate warnings and/or reviews from other passengers about customer service, negative experiences and/or prior incidents.

35. With regard to the subject excursion specifically, Carnival's promotional material and information did not require or recommend any particular level of experience to participate in the excursion.  In fact, Carnival's promotional material represented that the activity level for the subject excursion was "easy". However, and in reality, the subject excursion was not easy because excursion participants were invited to swim in the ocean water as part of the excursion, and in doing so, the excursion participants encountered dangerously strong current.

36. To be sure, before the subject incident, Carnival and the Excursion Entities knew or should have known that the subject shore excursion exposed participants to dangerously strong water current because on or about August 14, 2014, another Carnival passenger died while participating on the same or similar shore excursion, which was owned and/or co-operated by Defendant, Carnival Corp. and Defendant, Cruise Ship Excursions, Inc., and that passenger died

due in full or in part to dangerously strong water currents in the area where the Decedent in this case also died. *See Pucci v. Carnival Corp.*, 146 F.Supp.3d 1281 (S.D. Fl. 2015).

37. Carnival and the Excursion Entities knew or should have known that the swim area it would take Plaintiff's family and the Decedent for the subject excursion would present dangerously strong current because, prior to the subject incident and pursuant to Carnival's own policies and procedures, managerial employees of Carnival's shoreside headquarters, the Captain of the vessel, the shore excursion providers and other managerial shipboard employees (i.e. Director of Shore Excursions) would set up telephonic meetings and/or exchange emails before a Carnival cruise vessel calls at any specific port. One purpose of the pre-port stop meeting and/or information exchange is to discuss hazardous and/or dangerous conditions that threaten the vessel or passengers during the port stop and shore excursions. Had Carnival and the Excursion Entities properly conducted this meeting before the subject incident, Carnival and the Excursion Entities would have learned of and/or discussed this potential rip current hazard in the area of the subject swim area.  Therefore, Carnival and the Excursion Entities knew or should have known that the current in the subject area would be dangerous at the time of the subject excursion. This meeting also would have given Carnival and/or the Excursion Entities an opportunity to cancel the subject excursion, given the strength of the current at the time of the subject excursion. As such, the Excursion Entities did or should have warned Carnival of same so that Carnival could have made the decision to cancel the subject excursion, modify it and/or provide appropriate warnings to Plaintiff's family and the Decedent, so that they could make an informed decision as to whether or not to participate in the excursion.

38. While the above information was unknown to Plaintiff and the Decedent, the Plaintiff and the Decedent reviewed the foregoing promotional information and/or material from Carnival, including Carnival's website and brochures, concerning excursions generally and the subject

excursion.  Specifically, on or about October 20, 2022, Plaintiff reviewed Carnival's website prior to boarding the vessel.

39. The information and/or material Carnival made available and/or distributed to passengers concerning shore excursions, including the Plaintiff and the Decedent concerning the subject excursion, was based on the description and/or information provided to Carnival by the Excursion Entities and/or by Carnival's inspections and/or approval of the subject excursion and/or of the Excursion Entities.  Accordingly, Defendants undertook a duty to accurately advise passengers, including the Plaintiff, concerning the subject excursion in order to obtain a profit for Defendants, and Defendants were required to execute that duty utilizing reasonable care under the circumstances.

## Subject Incident

40. Relying on the safety and reputability of Carnival, as well as Carnival's representations regarding its shore excursions, including the subject excursion, Plaintiff's family, including the Decedent, decided to participate in the subject excursion and purchased tickets for the subject excursion directly from Carnival on October 20, 2022.

41. The Plaintiff, Plaintiff's family and the Decedent obtained all of the information regarding the subject excursion from Carnival's website, and made all of the reservation arrangements for the subject excursion exclusively with Carnival.  In turn, Carnival received a portion of Plaintiff's family's and the Decedent's ticket price for the subject excursion.

42. The Plaintiff and the Decedent reviewed Carnival's information and/or material concerning the subject excursion and relied upon Carnival's representations exclusively and to Plaintiff's family and the Decedent's detriment in deciding to purchase the subject excursion from Carnival and to participate in same during the cruise aboard the *Carnival Celebration*.

43. Based upon Carnival's information and/or material concerning the subject excursion, Plaintiff's family and the Decedent reasonably understood that Carnival conducted regular inspections of the facilities, vessel(s), operations and operators of the subject excursion to ensure that they were reasonably safe, and Plaintiff and the Decedent relied upon such understanding to Plaintiff and the Decedent's detriment in deciding to purchase the subject excursion from Carnival and to participate in same during Plaintiff's cruise aboard the *Carnival Celebration*.

44. On or about February 16, 2023, as part of the cruise aboard the *Carnival Celebration*, Plaintiff's family and the Decedent participated in the subject excursion in the U.S. Virgin Islands.

45. This excursion was arranged for, sponsored, recommended, operated, marketed and/or sold by Carnival as part of the cruise aboard the *Carnival Celebration*.  Unbeknownst to Plaintiff's family and the Decedent at the time, the excursion was operated or co-operated by the Excursion Entities.

46. The subject excursion consisted of a cruise on a catamaran to a spot about 100 yards from a beach, where the catamaran would drop anchor. While the catamaran was at anchor, shore excursion participants could go into the water from the catamaran; or they could take a dinghy that would transport them to a sandbar to watch turtles swim, or all the way to the beach. The tour group consisted of about 30 passenger participants and 3 crewmembers, all aboard the catamaran.

47. The tour began once all passenger participants were onboard, and the catamaran set sail. The catamaran sailed for about one hour, until it got to the anchor point, where tour participants were able to leave the ship and swim in the ocean water.

48. Once at the anchor point, at which the catamaran rested at anchor about 100 yards from the shore, the Captain first asked all participants if anyone had a heart condition. Heather Burton told the Captain that the Decedent had a heart condition, and pointed the Decedent out to the

Captain; the Captain simply acknowledged the Decedent and his condition, but did not give any instructions to limit his participation in the excursion.

49. Then, while still at the anchor point, the Captain explained to tour participants where on the vessel tour participants could borrow masks and snorkel gear to use in the water; and that tour participants could either jump into the water from the catamaran; or a dinghy would take passengers in small groups to a sandbar and the beach to watch turtles.

50. Within 5 minutes, the Captain finished his speech, which did not warn tour participants of the strong current in the area, did not test or evaluate participant's swimming ability while they were in the water, did not sufficiently explain to tour participants how to breathe underwater with a snorkel, how to swim with a life vest, how to inflate a life vest, and did not sufficiently explain how to swim in the water using the buddy system; and many passengers jumped in the water from the catamaran, and others formed a line to take the dinghy to shore.

51. Trevon Burton jumped in the water from the catamaran; Cynthia Hills, Heather Burton, K.B., L.B. and the Decedent got in line for the dinghy, and within 15 minutes they were on the dinghy together. While aboard the dinghy, the operator told the group that they could get off the dinghy at the sandbar to watch the turtles swim in the water, and the group took the dinghy operator's recommendation. The sandbar was about 50 yards from shore.

52. As soon as Heather Burton, Cynthia Hills, K.B., L.B. and the Decedent got in the water, about 50 yards from shore, they immediately struggled to swim and became separated due to the strong current in the water. Within 30 minutes, Cynthia Hills, Heather Burton, K.B. and L.B. had regrouped together at the beach shoreline, but by then the Decedent was located face down in the water.

53. Within 15 minutes thereafter, the dinghy operator took the Decedent to the shore. The Excursion Entities did not know how to perform CPR, so Heather Burton did on the Decedent. A

few minutes later, a member of the Excursion Entities came with a bag that said "AED" on it, but when he opened the bag, there was no AED[2] inside.

54. Forty-five minutes later paramedics reached this island where the Decedent remained lifeless, and the paramedics took the Decedent to a land-based hospital, where the Decedent was pronounced dead.

55. The waters in which the Decedent drowned were territorial waters of the U.S. Virgin Islands (i.e. within three nautical miles of the U.S.V.I. shore); and thus, are waters of a U.S. territory, such that the Death on the High Seas Act does not apply; but U.S. territory and/or state law wrongful death remedies and damages do apply, such as U.S. Virgin Islands, Indiana and/or Florida wrongful death remedies/damages, and are invoked herein.

56. The Decedent's death, and Plaintiff's family's emotional damages, were caused by dangerous conditions associated with the subject shore excursion that include, but are not limited to: i) the strong rip current; ii) insufficient snorkel and/or swim instructions provided by Carnival and/or the Excursion Entities, including the lack of recommendation and/or enforcement of a buddy system amongst swimmers; iii) insufficient swim or snorkel gear provided by Carnival and/or the Excursion Entities; iv) the lack of look-outs and/or lifeguards provided by Carnival and/or the Excursion Entities for the subject excursion; v) the lack of functional life vests provided by Carnival and/or the Excursion Entities; vi) the poor or completely absent emergency response plan promulgated by Carnival and/or the Excursion Entities; vii) the lack of an AED on scene for Carnival and/or the Excursion Entities; and viii) the lack of warnings by Carnival and/or the Excursion Entities about the above dangerous conditions.

---

[2] "AED" stands for Automated External Defibrillator; it is a device that is used to deliver an electric shock to victims who have ingested water, to restore their heart rhythm to normal.

57. As a result of the incident described above, and as a direct result of the negligence of Carnival and the Excursion Entities, the Decedent died, and Plaintiff's family suffered severe mental distress, including, but not limited to, anxiety, emotional flashbacks and depression, with physical manifestations, which include, but are not limited to, gastrointestinal pain and uncomfortable discharge, poor sleep, and lack of appetite. As a result of the Decedent's death, Plaintiff's family also suffered loss of love, nurture, companionship and services.

58. Plaintiff's family suffered this emotional distress with accompanying physical manifestations due to their direct experience swimming in the dangerous ocean water that was fraught with strong currents in which they all struggled to swim, as well as personally witnessing the Decedent's slow and agonizing death caused by drowning and Defendants' poor rescue response.

### Carnival's Notice of the Dangerous Excursion and/or Incompetent Providers

59. The subject excursion was not competently operated by properly trained and/or supervised persons, and/or it was unreasonably hazardous for reasons that include, but are not limited to: i) the strong current in the area used for the excursion; ii) insufficient snorkel and/or swim instructions provided by Carnival and/or the Excursion Entities, including the lack of recommendation and/or enforcement of a buddy system amongst swimmers; iii) insufficient swim or snorkel gear provided by Carnival and/or the Excursion Entities; iv) the lack of look-outs and/or lifeguards provided by Carnival and/or the Excursion Entities for the subject excursion; v) the lack of functional life vests provided by Carnival and/or the Excursion Entities; vi) the poor or completely absent emergency response plan promulgated by Carnival and/or the Excursion Entities; vii) the lack of an AED on scene for Carnival and/or the Excursion Entities; and viii) the lack of warnings by Carnival and/or the Excursion Entities about the above dangerous conditions.

60. The incompetence and/or hazardous conditions of the excursion should have been discovered by Carnival and the Excursion Entities before the incident had Carnival and the Excursion Entities properly evaluated the weather and sea conditions of the subject excursion and/or conducted an adequate inspection of the subject excursion operation to ensure it was reasonably safe before repeatedly recommending the excursion to its passengers, including Plaintiff, to the exclusion of other excursions not offered by Carnival.

61. For example, prior to the subject incident and pursuant to Carnival's own policies and procedures, managerial employees of Carnival's shoreside headquarters, the Captain of the vessel, the shore excursion providers and other managerial shipboard employees (i.e. Director of Shore Excursions) meet before a Carnival cruise vessel calls at any specific port. One purpose of the meeting is to discuss hazardous and/or dangerous conditions that threaten the vessel and passengers during the port stop and/or shore excursions. Had Carnival and/or the Excursion Entities properly conducted this meeting before the subject incident, Carnival and/or the Excursion Entities would have learned of and/or discussed this potential rip current hazard in the area of the subject beach. Therefore, Carnival and the Excursion Entities knew or should have known that the current in the subject area would be dangerous at the time of the subject excursion. This meeting also would have given Carnival and the Excursion Entities an opportunity to cancel the subject excursion, given the strength of the current at the time of the subject excursion.

62. Similarly, prior to the subject incident, it was the Excursion Entities' practice to monitor weather and sea conditions to determine the safety of shore excursion participants, and to report any potential hazards to Carnival before the excursion takes place. Had the Excursion Entities, which are based in U.S.V.I., reasonably monitored the weather and sea conditions in U.S.V.I. before the subject incident, they too would have appreciated the severity of the current, of which Carnival and the Excursion Entities should have reasonably anticipated would cause

adverse swimming conditions and unreasonable danger for shore excursion participants at the scene and on the day of the subject incident.

63. In addition, before the subject incident, Carnival was or should have been on notice that the subject excursion was dangerous and/or not suitable for passengers due to other passengers being similarly injured as a result of the same or similar dangerous conditions alleged herein on similar excursion(s) provided by Carnival, its local shore excursion operators and/or operated by the Excursion Entities, including, but not limited to, the following:

    a. *Pucci v. Carnival Corp. and Cruise Ship Excursions Inc.*, 146 F. Supp. 3d 1281 (S.D. Fla. 2015) (on or about August 14, 2014, another Carnival passenger died while participating on the same or similar shore excursion, which was owned and/or co-operated by Defendant, Carnival Corp. and Defendant, Cruise Ship Excursions, Inc., and that passenger died due in full or in part to dangerously strong water currents in the area where the Decedent in this case also died);

    b. *Blow v. Carnival Corp., et. al.*, 2023 WL 3686840 (S.D. Fla. May 26, 2023) (Carnival cruise passenger died while participating in a snorkel excursion provided by Carnival Corp.; raising similar allegations here that the excursion entity sponsored by Carnival did not properly monitor the dangerous weather and sea conditions in the area);

    c. *Lafountain v. Carnival Corp., et. al.*, Case No. 22-cv-22956 (S.D. Fla. 2022) (Carnival cruise passenger died while participating in a beach excursion provided by Carnival Corp.; raising similar allegations here that the excursion entity sponsored by Carnival did not properly monitor the dangerous weather and sea conditions in the area)

    d. *Nichols v. Carnival Corp.*, 2019 WL 11556754 (S.D. Fla. 2019) (action stemming from the decedent's drowning during shore excursion offered and provided by Carnival; raising similar allegations here that the excursion entity sponsored by Carnival did not provide adequate look outs);

    e. *Smith v. Carnival Corp.*, 584 F. Supp. 2d 1343, 1345 (S.D. Fla. 2008) (plaintiff brought wrongful death and related claims against Carnival and shore excursion company for the drowning of the decedent during an excursion in the Cayman Islands; raising similar allegations here that the excursion entity sponsored by Carnival did not provide adequate instructions);

    f. *Joseph v. Carnival Corp.*, 2011 WL 3022555 (S.D. Fla. 2011) (plaintiff claiming negligence against Carnival for providing and sponsoring a shore excursion in which the shore excursion operator did not provide reasonably safe instructions or look-out);

g. *Monaghan v. Carnival Corp.*, 07-20492-CIV, 2007 WL 9709736, at *1 (S.D. Fla. 2007) (alleging negligence against Carnival for the wrongful death of the passenger who died allegedly participating in an excursion advertised and operated by Carnival; raising similar allegations here that the excursion entity sponsored by Carnival did not provide adequate instructions, gear or lookout).

64. Further, before Plaintiff's incident, Carnival was or should have been on notice that the excursion was not reasonably safe for passengers.  This notice was or should have been acquired through Carnival's initial approval process and/or its yearly inspections of the subject excursion.

65. Specifically, before offering excursions to passengers, the excursions and/or the excursion operators are subject to Carnival's approval pursuant to policies and procedures promulgated by Carnival.  This is a duty undertaken by Carnival, in part, so that it may make the aforementioned representations concerning the subject excursion to its passengers in an effort to generate a profit for Carnival.  Accordingly, Carnival is required to execute this duty with reasonable care under the circumstances.

66. During the excursion approval process, Carnival is supposed to verify whether the operator is qualified and competent to operate the subject excursion and provide the excursion. This investigation includes Carnival understanding the layout and natural conditions in the area where the subject excursion is to take place (here, the naturally strong current in the area); actually identifying the equipment offered by the Excursion Entities (i.e. swim gear, snorkel gear, life vests, etc.) – or lack thereof; and identifying the Excursion Entities employees on scene for the subject excursion. Had Carnival done this inspection properly, and for example, Carnival would have learned that the current in the area where the Excursion Entities took Carnival's passengers was dangerously strong; and that the ratio of Excursion Entities employees compared to passenger participants, for look-out purposes, was inadequate (i.e. a 1:10 ratio).

67. The excursion operators also provide Carnival details pertaining to the excursion, including, but not limited to, the location, a description, restrictions, and/or participation levels for

the excursion; and in turn, Carnival independently investigates and verifies the excursion and natural conditions. Had Carnival reasonably investigated, it would have learned that the shore excursion location naturally encounters strong currents, especially during the summer hurricane season.

68. Part of the approval process also entails Carnival's representatives personally inspecting and participating in the excursion being proposed, including the vessel and operations, under similar conditions to which the passenger participants are to be exposed. Had Carnival inspected the excursion site, including the area where the Excursion Entities encouraged participants to swim, Carnival would have learned of the naturally strong current in the area of the subject excursion; the lack of functional life vests available for the subject excursion; the inadequate number of look outs (3) for the number of participants expected (30), which did not provide sufficient look out for shore excursion participants.

69. Accordingly, taking the subject excursion under the same or similar circumstances as the subject incident did or should have revealed that the subject excursion was dangerous and/or not suitable for passengers due to: i) the strong rip current at the beach; ii) the lack of look-outs and/or lifeguards provided by Carnival and/or the Excursion Entities for the subject excursion; iii) the lack of functional life vests provided by Carnival and/or the Excursion Entities; and iv) the poor or completely absent emergency response plan promulgated by Carnival and/or the Excursion Entities.

70. Moreover, once an excursion is approved and accepted by Carnival, Carnival sends excursion operators standards, policies, and/or procedures that the operators must adhere to while Carnival is offering their excursions to its passengers. Additionally, the excursion operators are subject to yearly inspections and/or approval by Carnival, wherein Carnival is supposed to conduct site inspections of the excursion as well as the vessel and/or operations of the excursion.  The

yearly inspections and/or approval process also requires excursion operators to submit yearly "bids" and/or reports to Carnival, wherein the operators disclose the details of incidents that occurred during the excursion involving cruise line passengers (among other information).  Thus, before Plaintiff and the Decedent's incident, Carnival was or should have been on notice that cruise ship passengers were injured participating in these types of excursions.  Further, Carnival's yearly inspections and/or approval process, including taking the subject excursion under the same or similar circumstances as the subject incident, did or should have revealed that the subject excursion was dangerous and/or not suitable for passengers due to: i) the strong rip current at the beach; ii) the lack of look-outs and/or lifeguards provided by Carnival and/or the Excursion Entities for the subject excursion; iii) the lack of functional life vests provided by Carnival and/or the Excursion Entities; and iv) the poor or completely absent emergency response plan promulgated by Carnival and/or the Excursion Entities.

71. Lastly, prior to offering the subject excursion to Plaintiff's family, Carnival did not know the identity or competency of the shore excursion personnel the Excursion Entities employed for the subject excursion on the day of the subject incident. As such, Carnival failed to reasonably investigate the shore excursion provider, despite Carnival's representation that it "hand select[s] the best local providers at every port of call". *See Perry v. HAL Antillen NV*, 2013 WL 2099499 (W.D. Wash 2013) (denying summary judgment on a negligent selection claim because the cruise line did not know of the subcontractor who the excursion operator employed to transport shore excursion participants; despite the cruise line's representation that it had "take[n] steps to identify and contract with reputable tour operators").

**COUNT I – MISLEADING ADVERTISING IN VIOLATION OF
FLORIDA STATUTE § 817.41 AGAINST DEFENDANTS**

The Plaintiff re-alleges, adopts, and incorporate by reference the allegations in paragraphs one (1) through seventy-one (71) as though alleged originally herein.

72. On or about October 20, 2022, Plaintiff's family and the Decedent reviewed Carnival's website prior to boarding the vessel, including the information set forth in paragraphs 23-27 and 31-34 above.

73. At all times material hereto, Carnival's promotional material, including its website and/or brochure referenced above, which Plaintiff reviewed, contained the statements and descriptions set forth in paragraphs 23-27 and 31-34 above.

74. At all times material hereto, Carnival's oral representations and Carnival's promotional material, including its website and/or brochure referenced above, which Plaintiff's family and the Decedent reviewed, contained misrepresentations of material facts, including:

a. Misrepresenting that the activity level for the subject excursion was "easy"; when in reality, the subject excursion was not easy because all shore excursion participants at the actual excursion on the date of the subject incident who accepted Carnival and/or the Excursion Entities invitation to swim in the beach water encountered dangerous current and difficulty in swimming; and after the subject incident, Defendants changed the activity level to "moderate" and prohibited participation by people with cardiac conditions;

b. Misrepresenting that "snorkel gear and instructions provided"; when in reality, the Defendants did not provide reasonably safe snorkel gear or reasonably safe snorkel instructions as Plaintiff's family and the Decedent did not receive reasonably safe snorkel gear or reasonably safe snorkel instructions;

c. Misrepresenting that "4 years old" was the minimum age for safe participation for the tour; when in reality a 4 year old could not safely participate in the excursion as the water current was too strong for a 4 year old to safely swim; and after the subject incident the Defendants changed the minimum age to 6 years old;

d. Misrepresenting that the excursion providers are safe, reliable and/or reputable, as alleged in paragraphs 31-34, when in actuality, the subject excursion was not reasonable safe, for reasons alleged in paragraphs 40-58, and/or passengers' comments, complaints or information concerning safety concerns and/or prior incidents are

- 25 -

censored, altered and/or deleted on publicly available website(s) operated and/or controlled by Carnival; and/or

e.  Representing and/or implying that excursion providers would be subject to personal jurisdiction in the United States and/or subject to United States and/or Florida law by contractually requiring all Carnival passengers (including the Plaintiff) to file suit in a specific jurisdiction in the United States for all claims arising from the subject cruise (including incidents that occur while participating in shore excursions), pursuant to its ticket contract, and/or advertising that its excursion providers are insured, as alleged in paragraphs 31-34, when in actuality, excursion entities (including the Excursion Entities) challenge this Court's personal jurisdiction.

75. Pursuant to Florida Statute § 817.41(4), Carnival as well as the Excursion Entities are responsible for the foregoing false and/or misleading advertisements because Defendants were named in and/or obtained the benefits of the statements and/or advertisements which Carnival distributed from its headquarters in Miami, Florida, U.S.A.

76. At all times material hereto, the foregoing statements Carnival made and/or disseminated were known, or through the exercise of reasonable care or investigation could or might have been ascertained, to be false and/or misleading.  This knowledge was or should have been acquired through: (a) Carnival's initial approval process of the Excursion Entities and/or the excursion, including, but not limited to, having Carnival's representative(s) take the excursion under the same or similar circumstances as the subject incident, as alleged in paragraphs 35-37 and 59-71; (b) Carnival's yearly inspections of the Excursion Entities and/or the excursion, including, but not limited to, conducting site inspections under the same or similar circumstances as the subject incident, as alleged in paragraphs 35-37 and 59-71; and/or (c) prior incidents involving Carnival passengers who drowned while participating in ocean water excursions, as alleged at paragraphs 59-61.

77. At all times material hereto, the statements were so made or disseminated with the intent or purpose, either directly or indirectly, of inducing passengers (including Plaintiff and the

Decedent) to rely on the statements and act by purchasing tickets for shore excursions (including the subject excursion), as evident in the photographs included in paragraphs 23-27 and 31-34.

78. At all times material hereto, the Plaintiff's family and the Decedent justifiably relied on the representations made by Carnival when Plaintiff's family and the Decedent purchased tickets for the subject excursion and participated in the subject excursion. Plaintiff's family and the Decedent's reliance on Carnival's representations were justified considering that Plaintiff's family and the Decedent were residents of Indiana and Illinois, respectively, and Carnival was in the business of offering shore excursions to thousands of passengers daily from which it earned tens of millions of dollars a year (or more).  As a result, Carnival was in a much stronger position to identify the potential dangers and/or inequities that passengers (like Plaintiff's family and the Decedent) will encounter when participating in excursions and/or when involved in incident(s) and/or dispute(s) with excursion providers. Plaintiff's family and the Decedent therefore justifiably relied on Carnival to accurately advise them concerning the excursion providers and/or the subject excursion as alleged in paragraphs 38.  Plaintiff's family and the Decedent's reliance on Carnival's representations was also justified because Carnival made all arrangements for the subject excursion; Carnival marketed the subject excursion using its company logo; Carnival recommended its passengers to not engage in excursions, tours and/or activities that are not sold through Carnival; and/or Plaintiff's family and the Decedent exclusive contacts concerning the subject excursion was with Carnival and/or Carnival's onboard excursion desk until the point that Plaintiff's family and the Decedent actually participated in the subject excursion. Further, had Carnival not made the foregoing representations, Plaintiff's family and the Decedent would have made a different decision, such as not participating in the subject excursion if it was not actually operated by Carnival.

79. As a direct result of the foregoing dangerous conditions to which the Decedent was exposed: Ronald Fitch suffered pre-death pain and suffering and died, and Plaintiff seeks recovery for such damages herein; and as further result, his Estate, family, survivors and/or beneficiaries incurred, as a result of his death, medical and/or body transportation expenses, funeral expenses, lost Ronald Fitch's financial contributions, lost Ronald Fitch's household support and services; and lost, among other available category of damages, Ronald Fitch's love, guidance and companionship; and suffered their own mental pain and suffering.

**WHEREFORE**, the Plaintiff demands damages, on behalf of the Decedent and all of the Decedent's heirs, survivors and beneficiaries, as allowed under the applicable state law and/or USVI wrongful death statute(s) and/or survival act(s), including, but not limited to, loss of support, past and future earnings, loss of services, pain and suffering, and funeral expenses. In addition, or in the alternative, the Plaintiff demands all damages recoverable under General Maritime Law and/or applicable state law. The Plaintiff further demands trial by jury.

## COUNT II – NEGLIGENT MISREPRESENTATION AGAINST DEFENDATS

The Plaintiff re-alleges, adopts, and incorporate by reference the allegations in paragraphs one (1) through seventy-one (71) as though alleged originally herein.

80. On or about October 20, 2022, Plaintiff's family and the Decedent reviewed Carnival's website prior to boarding the vessel, including the information set forth in paragraphs 23-27 and 29-32 above.

81. At all times material hereto, Carnival's promotional material, including its website and/or brochure referenced above, which Plaintiff reviewed, contained the statements and descriptions set forth in paragraphs 23-27 and 31-34 above.

82. At all times material hereto, Carnival's oral representations and Carnival's promotional material, including its website and/or brochure referenced above, which Plaintiff's family and the Decedent reviewed, contained misrepresentations of material facts, including:

    a. Misrepresenting that the activity level for the subject excursion was "easy"; when in reality, the subject excursion was not easy because all shore excursion participants at the actual excursion on the date of the subject incident who accepted Carnival and/or the Excursion Entities invitation to swim in the beach water encountered dangerous current and difficulty in swimming; and after the subject incident, Defendants changed the activity level to "moderate" and prohibited participation by people with cardiac conditions;

    b. Misrepresenting that "snorkel gear and instructions provided"; when in reality, the Defendants did not provide reasonably safe snorkel gear or reasonably safe snorkel instructions as Plaintiff's family and the Decedent did not receive reasonably safe snorkel gear or reasonably safe snorkel instructions;

    c. Misrepresenting that "4 years old" was the minimum age for safe participation for the tour; when in reality a 4 year old could not safely participate in the excursion as the water current was too strong for a 4 year old to safely swim; and after the subject incident the Defendants changed the minimum age to 6 years old;

    d. Misrepresenting that the excursion providers are safe, reliable and/or reputable, as alleged in paragraphs 31-34, when in actuality, the subject excursion was not reasonable safe, for reasons alleged in paragraphs 40-58, and/or passengers' comments, complaints or information concerning safety concerns and/or prior incidents are censored, altered and/or deleted on publicly available website(s) operated and/or controlled by Carnival; and/or

    e. Representing and/or implying that excursion providers would be subject to personal jurisdiction in the United States and/or subject to United States and/or Florida law by contractually requiring all Carnival passengers (including the Plaintiff) to file suit in a specific jurisdiction in the United States for all claims arising from the subject cruise (including incidents that occur while participating in shore excursions), pursuant to its ticket contract, and/or advertising that its excursion providers are insured, as alleged in paragraphs 30-34, when in actuality, excursion entities (including the Excursion Entities) challenge this Court's personal jurisdiction.

83. Pursuant to Florida Statute § 817.41(4), Carnival as well as the Excursion Entities are responsible for the foregoing false and/or misleading advertisements because Defendants were named in and/or obtained the benefits of the statements and/or advertisements which Carnival distributed from its headquarters in Miami, Florida, U.S.A.

84. At all times material hereto, the foregoing statements Carnival made and/or disseminated were known, or through the exercise of reasonable care or investigation could or might have been ascertained, to be false and/or misleading.  This knowledge was or should have been acquired through: (a) Carnival's initial approval process of the Excursion Entities and/or the excursion, including, but not limited to, having Carnival's representative(s) take the excursion under the same or similar circumstances as the subject incident, as alleged in paragraphs 33-35 and 57-69; (b) Carnival's yearly inspections of the Excursion Entities and/or the excursion, including, but not limited to, conducting site inspections under the same or similar circumstances as the subject incident, as alleged in paragraphs 33-35 and 57-69; and/or (c) prior incidents involving Carnival passengers who drowned while participating in ocean water excursions, as alleged at paragraphs 57-59.

85. At all times material hereto, the statements were so made or disseminated with the intent or purpose, either directly or indirectly, of inducing passengers (including Plaintiff and the Decedent) to rely on the statements and act by purchasing tickets for shore excursions (including the subject excursion), as evident in the photographs included in paragraphs 21-25 and 29-32.

86. At all times material hereto, the Plaintiff's family and the Decedent justifiably relied on the representations made by Carnival when Plaintiff's family and the Decedent purchased tickets for the subject excursion and participated in the subject excursion. Plaintiff's family and the Decedent's reliance on Carnival's representations were justified considering that Plaintiff's family and the Decedent were residents of Indiana and Illinois, respectively, and Carnival was in the business of offering shore excursions to thousands of passengers daily from which it earned tens of millions of dollars a year (or more).  As a result, Carnival was in a much stronger position to identify the potential dangers and/or inequities that passengers (like Plaintiff's family and the Decedent) will encounter when participating in excursions and/or when involved in incident(s)

and/or dispute(s) with excursion providers. Plaintiff's family and the Decedent therefore justifiably relied on Carnival to accurately advise them concerning the excursion providers and/or the subject excursion as alleged in paragraphs 36.  Plaintiff's family and the Decedent's reliance on Carnival's representations was also justified because Carnival made all arrangements for the subject excursion; Carnival marketed the subject excursion using its company logo; Carnival recommended its passengers to not engage in excursions, tours and/or activities that are not sold through Carnival; and/or Plaintiff's family and the Decedent exclusive contacts concerning the subject excursion was with Carnival and/or Carnival's onboard excursion desk until the point that Plaintiff's family and the Decedent actually participated in the subject excursion. Further, had Carnival not made the foregoing representations, Plaintiff's family and the Decedent would have made a different decision, such as not participating in the subject excursion if it was not actually operated by Carnival.

87. As a direct result of the foregoing dangerous conditions to which the Decedent was exposed: Ronald Fitch suffered pre-death pain and suffering and died, and Plaintiff seeks recovery for such damages herein; and as further result, his Estate, family, survivors and/or beneficiaries incurred, as a result of his death, medical and/or body transportation expenses, funeral expenses, lost Ronald Fitch's financial contributions, lost Ronald Fitch's household support and services; and lost, among other available category of damages, Ronald Fitch's love, guidance and companionship; and suffered their own mental pain and suffering.

**WHEREFORE**, the Plaintiff demands damages, on behalf of the Decedent and all of the Decedent's heirs, survivors and beneficiaries, as allowed under the applicable state law and/or USVI wrongful death statute(s) and/or survival act(s), including, but not limited to, loss of support, past and future earnings, loss of services, pain and suffering, and funeral expenses. In addition, or

in the alternative, the Plaintiff demands all damages recoverable under General Maritime Law and/or applicable state law. The Plaintiff further demands trial by jury.

**COUNT III – NEGLIGENT SELECTION AND/OR RETENTION AGAINST CARNIVAL**

The Plaintiff re-alleges, adopts, and incorporate by reference the allegations in paragraphs one (1) through seventy-one (71) as though alleged originally herein.

88. At all times material hereto, it was the duty of Carnival to provide Plaintiff and the Decedent with reasonable care under the circumstances.

89. At all times material hereto, Carnival had a duty to select and/or hire competent and/or fit excursion operators.

90. At all times material hereto, as part of its duty to select and/or hire competent and/or fit excursion operators, it was incumbent on Carnival to diligently inquire into the Excursion Entities' identity, competency and fitness, including that of their employees and/or subcontractors.

91. On or about February 16, 2023, Carnival and/or its agents, servants, joint venturers and/or employees breached its duty to provide Plaintiff's family and the Decedent with reasonable care under the circumstances by selecting and/or retaining the Excursion Entities, which were incompetent and/or unfit based on the following:

   a. The failure of the Excursion Entities to provide a reasonably safe excursion;

   b. The failure to identify the "boots on the ground" shore excursion operators, their qualifications and/or competencies;

   c. The failure of the Excursion Entities to recognize the strong current at the beach;

   d. The failure of the Excursion Entities to provide look-outs and/or lifeguards for the subject excursion;

   e. The failure of the Excursion Entities to safely and/or at reasonably frequent intervals monitor all excursion participants while they were in the water;

   f. The failure of the Excursion Entities to provide functional life vests;

g.   The failure of the Excursion Entities to provide a safe amount of employees in connection with the number of shore excursion participants;

h.   The failure of the Excursion Entities to have properly trained and supervised persons operating the subject excursion and/or assisting passengers during the excursion; and/or

i.   The failure of the Excursion Entities to adequately inspect the beach cove used for the subject excursion so as to identify its natural hazards.

92. At all times material hereto, Carnival knew of the foregoing conditions causing the subject incident and did not correct them, or the conditions existed for a sufficient length of time so that Carnival, in the exercise of reasonable care under the circumstances, should have learned of them and corrected them.  This knowledge was or should have been acquired through: (a) Carnival's initial approval process of the Excursion Entities and/or the excursion, including, but not limited to, having Carnival's representative(s) take the excursion under the same or similar circumstances as the subject incident, as alleged in paragraphs 33-35 and 57-69; (b) Carnival's yearly inspections of the Excursion Entities and/or the excursion, including, but not limited to, conducting site inspections under the same or similar circumstances as the subject incident, as alleged in paragraphs 33-35 and 57-69; and/or (c) prior incidents involving Carnival passengers who drowned while participating in ocean water excursions, as alleged at paragraphs 57-59. *See e.g. Pucci v. Carnival Corp. and Cruise Ship Excursions Inc.*, 146 F. Supp. 3d 1281 (S.D. Fla. 2015) (on or about August 14, 2014, another Carnival passenger died while participating on the same or similar shore excursion, which was owned and/or co-operated by Defendant, Carnival Corp. and Defendant, Cruise Ship Excursions, Inc., and that passenger died due in full or in part to dangerously strong water currents in the area where the Decedent in this case also died).

93. As a direct and proximate result of the Excursion Entities' incompetence and/or unfitness, Ronald Fitch died, and Plaintiff was injured and suffered severe mental distress while participating in the subject shore excursion due to conditions that include, but were not limited to:

i) the strong rip current at the beach; ii) the lack of look-outs and/or lifeguards provided by Carnival and/or the Excursion Entities for the subject excursion; iii) the lack of life vests provided by Carnival and/or the Excursion Entities; and iv) the poor or completely absent emergency response plan promulgated by Carnival and/or the Excursion Entities. These factors caused and/or contributed to the Ronald Fitch's death and the living Plaintiff's emotional injuries, and therefore, the subject incident would not have occurred but for Carnival and/or the Excursion Entities' incompetence and/or unfitness.

94. As a direct result of the foregoing dangerous conditions to which the Decedent was exposed: Ronald Fitch suffered pre-death pain and suffering and died, and Plaintiff seeks recovery for such damages herein; and as further result, his Estate, family, survivors and/or beneficiaries incurred, as a result of his death, medical and/or body transportation expenses, funeral expenses, lost Ronald Fitch's financial contributions, lost Ronald Fitch's household support and services; and lost, among other available category of damages, Ronald Fitch's love, guidance and companionship; and suffered their own mental pain and suffering.

**WHEREFORE**, the Plaintiff demands damages, on behalf of the Decedent and all of the Decedent's heirs, survivors and beneficiaries, as allowed under the applicable state law and/or USVI wrongful death statute(s) and/or survival act(s), including, but not limited to, loss of support, past and future earnings, loss of services, pain and suffering, and funeral expenses. In addition, or in the alternative, the Plaintiff demands all damages recoverable under General Maritime Law and/or applicable state law. The Plaintiff further demands trial by jury.

**COUNT IV – NEGLIGENT FAILURE TO WARN AGAINST CARNIVAL**

The Plaintiff re-alleges, adopts, and incorporate by reference the allegations in paragraphs one (1) through seventy-one (71) as though alleged originally herein.

95. At all times material hereto, it was the duty of Carnival to provide Plaintiff and the Decedent with reasonable care under the circumstances.

96. At all times material hereto, it was the duty of Carnival to warn passengers (like Plaintiff's family and the Decedent) of dangers that were known, or reasonably should have been known, to Carnival in places where passengers (like Plaintiff's family and the Decedent) are invited to or may reasonably be expected to visit beyond the point of disembarkation.

97. On or about February 16, 2023, the Plaintiff's family and the Decedent were participating in the subject excursion, which Carnival invited and reasonably expected Plaintiff's family and the Decedent to participate in since Carnival sold them tickets for the excursion.

98. On or about February 16, 2023, Carnival and/or its agents, servants, joint venturers and/or employees breached its duty to warn the Plaintiff's family and the Decedent through the following acts and/or omissions:

a. Failure to adequately warn passengers (including Plaintiff's family and the Decedent) of the dangers associated with participating in the subject excursion, as outlined at paragraphs 26 and 54; and/or

b. Failure to adequately warn passengers (including Plaintiff's family and the Decedent) of the strong current at the swim site for the excursion;

c. Failure to adequately warn passengers (including Plaintiff's family and the Decedent) that the Excursion Entities would not provide look-outs and/or lifeguards for the subject excursion;

d. Failure to adequately warn passengers (including Plaintiff's family and the Decedent) that the Excursion Entities would not provide functional life vests;

e. Failure to adequately warn passengers (including Plaintiff's family and the Decedent) that the Excursion Entities would not carry individuals trained in CPR or an AED on scene in the event of an emergency;

f.  Failure to adequately warn and/or communicate to passengers (including Plaintiff's family and the Decedent) that Carnival does not adequately inspect the scene used for the subject excursion, despite the subject excursion being promoted as "hand selected" by Carnival;

g.  Failure to adequately warn and/or communicate to passengers (including Plaintiff's family and the Decedent) that Carnival does not verify that the subject excursion and/or the equipment used for the excursion is/are reasonably safe and/or inspected, despite the subject excursion being promoted as "hand selected" by Carnival; and/or

h.  Failure to adequately warn and/or communicate to passengers (including Plaintiff's family and the Decedent) that the Excursion Entities are not adhering to highest safety standards in the industry, as evident by the hazard and/or incompetence involved with the subject excursion; and/or

i.  Failure to adequately warn and/or communicate to passengers (including Plaintiff's family and the Decedent) that the Excursion Entities are not subject to jurisdiction in the United States, especially when Carnival contractually requires its passengers (including the Plaintiff) to file suit in a specific jurisdiction in the United States for all claims arising from the subject cruise (including incidents that occur while participating in shore excursions); and/or

j.  Failure to adequately warn and/or communicate to passengers (including Plaintiff's family and the Decedent) that the Excursion Entities carry independent insurance from the cruise line that has lower limits and more limited coverage than Carnival's insurance.

99.  The above acts and/or omissions caused and/or contributed to Ronald Fitch's death and the living Plaintiff injuries because Plaintiff and the Decedent would not have purchased tickets for and/or participated in the subject excursion had Carnival and/or its agents, servants, and/or employees adequately warned and/or communicated the foregoing to the Plaintiff and the Decedent.

100.  At all times material hereto, Carnival knew of the foregoing conditions causing the subject incident and did not correct them, or the conditions existed for a sufficient length of time so that Carnival, in the exercise of reasonable care under the circumstances, should have learned of them and corrected them.  This knowledge was or should have been acquired through: (a) Carnival's initial approval process of the Excursion Entities and/or the excursion, including, but

not limited to, having Carnival's representative(s) take the excursion under the same or similar circumstances as the subject incident, as alleged in paragraphs 33-35 and 57-69; (b) Carnival's yearly inspections of the Excursion Entities and/or the excursion, including, but not limited to, conducting site inspections under the same or similar circumstances as the subject incident, as alleged in paragraphs 33-35 and 57-69; and/or (c) prior incidents involving Carnival passengers who drowned while participating in ocean water excursions, as alleged at paragraphs 57-59. *See e.g. Pucci v. Carnival Corp. and Cruise Ship Excursions Inc*., 146 F. Supp. 3d 1281 (S.D. Fla. 2015).

101.    As a direct result of the foregoing dangerous conditions to which the Decedent was exposed: Ronald Fitch suffered pre-death pain and suffering and died, and Plaintiff seeks recovery for such damages herein; and as further result, his Estate, family, survivors and/or beneficiaries incurred, as a result of his death, medical and/or body transportation expenses, funeral expenses, lost Ronald Fitch's financial contributions, lost Ronald Fitch's household support and services; and lost, among other available category of damages, Ronald Fitch's love, guidance and companionship; and suffered their own mental pain and suffering.

**WHEREFORE**, the Plaintiff demands damages, on behalf of the Decedent and all of the Decedent's heirs, survivors and beneficiaries, as allowed under the applicable state law and/or USVI wrongful death statute(s) and/or survival act(s), including, but not limited to, loss of support, past and future earnings, loss of services, pain and suffering, and funeral expenses. In addition, or in the alternative, the Plaintiff demands all damages recoverable under General Maritime Law and/or applicable state law. The Plaintiff further demands trial by jury.

## COUNT V – GENERAL NEGLIGENCE AGAINST CARNIVAL

The Plaintiff re-alleges, adopts, and incorporate by reference the allegations in paragraphs one (1) through seventy-one (71) as though alleged originally herein.

102.    At all times material hereto, it was the duty of Carnival to provide Plaintiff's family and the Decedent with reasonable or ordinary care under the circumstances.

103.    On or about February 16, 2023, Carnival and/or its agents, servants, joint venturers and/or employees breached its duty to provide Plaintiff and the Decedent with reasonable or ordinary care under the circumstances, based on the following acts and/or omissions:

a.   Failure to provide a reasonably safe excursion;

b.   Failure to recognize the strong current at the swim area and either cancel the excursion or modify it to remedy the danger;

c.   Failure to provide look-outs and/or lifeguards for the subject excursion;

d.   Failure to provide functional life vests for the subject excursion;

e.   Failure to provide reasonable snorkel and/ow swim instructions;

f.   Promoting the subject excursion as "hand selected" by Carnival, thereby implying the excursion's vessel(s) and/or operations were reasonably safe under the circumstances, when in fact they were not;

g.   Censoring, altering and/or deleting comments on publicly available website(s) operated and/or controlled by Carnival so as to censor, alter and/or delete complaints or information concerning safety concerns and prior incidents similar to the subject incident, thereby implying that the subject excursion, the Excursion Entities and/or their operations were reasonably safe under the circumstances, when in fact they were not;

h.   Failure to adequately inspect and/or monitor excursion providers so as to ensure that the subject excursion was reasonably safe for passengers;

i.   Failure to regularly and/or adequately identify the highest safety standards in the industry for the activities offered in the subject excursion, and verify that the Excursion Entities are adhering to such standards; and/or

j.   Failure to regularly and/or adequately review the safety record of the Excursion Entities before recommending the subject excursion to passengers and the Plaintiff.

104.     All or some of the above acts and/or omissions by Carnival and/or its agents, servants, and/or employees, caused and/or contributed to Ronald Fitch's death and the living Plaintiffs' injuries while participating in the subject excursion.

105.     At all times material hereto, Carnival knew of the foregoing conditions causing the subject incident and did not correct them, or the conditions existed for a sufficient length of time so that Carnival, in the exercise of reasonable care under the circumstances, should have learned of them and corrected them.   This knowledge was or should have been acquired through: (a) Carnival's initial approval process of the Excursion Entities and/or the excursion, including, but not limited to, having Carnival's representative(s) take the excursion under the same or similar circumstances as the subject incident, as alleged in paragraphs 33-35 and 57-69; (b) Carnival's yearly inspections of the Excursion Entities and/or the excursion, including, but not limited to, conducting site inspections under the same or similar circumstances as the subject incident, as alleged in paragraphs 33-35 and 57-69; and/or (c) prior incidents involving Carnival passengers who drowned while participating in ocean water excursions, as alleged at paragraphs 57-59. *See e.g. Pucci v. Carnival Corp. and Cruise Ship Excursions Inc*., 146 F. Supp. 3d 1281 (S.D. Fla. 2015).

106.     As a direct result of the foregoing dangerous conditions to which the Decedent was exposed: Ronald Fitch suffered pre-death pain and suffering and died, and Plaintiff seeks recovery for such damages herein; and as further result, his Estate, family, survivors and/or beneficiaries incurred, as a result of his death, medical and/or body transportation expenses, funeral expenses, lost Ronald Fitch's financial contributions, lost Ronald Fitch's household support and services; and lost, among other available category of damages, Ronald Fitch's love, guidance and companionship; and suffered their own mental pain and suffering.

**WHEREFORE**, the Plaintiff demands damages, on behalf of the Decedent and all of the Decedent's heirs, survivors and beneficiaries, as allowed under the applicable state law and/or USVI wrongful death statute(s) and/or survival act(s), including, but not limited to, loss of support, past and future earnings, loss of services, pain and suffering, and funeral expenses. In addition, or in the alternative, the Plaintiff demands all damages recoverable under General Maritime Law and/or applicable state law. The Plaintiff further demands trial by jury.

### COUNT VI – GENERAL NEGLIGENCE AGAINST THE EXCURSION ENTITIES

The Plaintiff re-alleges, adopts, and incorporate by reference the allegations in paragraphs one (1) through seventy-one (71) as though alleged originally herein.

107.    At all times material hereto, the Excursion Entities co-owned and/or co-operated the subject excursion.

108.    At all times material hereto, it was the duty of the Excursion Entities to provide Plaintiff's family and the Decedent with reasonable care under the circumstances.

109.    On or about February 16, 2023, the Excursion Entities and/or their agents, servants, and/or employees breached their duty to provide Plaintiff's family and the Decedent with reasonable care under the circumstances, based on the following acts and/or omissions:

    a.   Failure to provide a reasonably safe excursion;

    b.   Failure to recognize the strong current at the swim area and either cancel the excursion or modify it to remedy the danger;

    c.   Failure to provide look-outs and/or lifeguards for the subject excursion;

    d.   Failure to provide functional life vests for the subject excursion;

    e.   Failure to provide reasonable snorkel and/ow swim instructions;

    f.   Failure to adequately inspect and/or monitor excursion provider employees and/or the scene of the subject excursion so as to ensure that the subject excursion was reasonably safe for passengers;

g.   Failure to ensure that properly trained and supervised persons operated the subject excursion; and/or

h.   Having a shore excursion that was not competently operated.

110.   All or some of the above acts and/or omissions by the Excursion Entities and/or their agents, servants, and/or employees, caused and/or contributed to Ronald Fitch's death and the living Plaintiff's injuries while participating in the subject excursion.

111.   As a direct result of the foregoing dangerous conditions to which the Decedent was exposed: Ronald Fitch suffered pre-death pain and suffering and died, and Plaintiff seeks recovery for such damages herein; and as further result, his Estate, family, survivors and/or beneficiaries incurred, as a result of his death, medical and/or body transportation expenses, funeral expenses, lost Ronald Fitch's financial contributions, lost Ronald Fitch's household support and services; and lost, among other available category of damages, Ronald Fitch's love, guidance and companionship; and suffered their own mental pain and suffering.

**WHEREFORE**, the Plaintiff demands damages, on behalf of the Decedent and all of the Decedent's heirs, survivors and beneficiaries, as allowed under the applicable state law and/or USVI wrongful death statute(s) and/or survival act(s), including, but not limited to, loss of support, past and future earnings, loss of services, pain and suffering, and funeral expenses. In addition, or in the alternative, the Plaintiff demands all damages recoverable under General Maritime Law and/or applicable state law. The Plaintiff further demands trial by jury.

## COUNT VII – NEGLIGENT FAILURE TO
## WARN AGAINST THE EXCURSION ENTITIES

The Plaintiff re-alleges, adopts, and incorporate by reference the allegations in paragraphs one (1) through seventy-one (71) as though alleged originally herein.

112.   At all times material hereto, it was the duty of the Excursion Entities to provide Plaintiff with reasonable care under the circumstances.

113.   At all times material hereto, it was the duty of the Excursion Entities to warn passengers (like Plaintiff's family and the Decedent) of dangers that were known, or reasonably should have been known, to the Excursion Entities in places where passengers (like Plaintiff's family and the Decedent) are invited to or may reasonably be expected to visit beyond the point of disembarkation.

114.   On or about February 16, 2023, the Plaintiff's family and the Decedent were participating in the subject excursion, which the Excursion Entities invited and reasonably expected Plaintiff's and the Decedent to participate in since Carnival contracted with the Excursion Entities to operate the excursion and sold Plaintiff's family and the Decedent the ticket for the excursion.

115.   On or about February 16, 2023, the Excursion Entities and/or its agents, servants, joint venturers and/or employees breached its duty to warn the Plaintiff's family and the Decedent through the following acts and/or omissions:

     a.   Failure to adequately warn passengers (including Plaintiff's family and the Decedent) of the dangers associated with participating in the subject excursion, as outlined at paragraphs 26 and 54; and/or

     b.   Failure to adequately warn passengers (including Plaintiff's family and the Decedent) of the strong current at the swim site for the excursion;

     c.   Failure to adequately warn passengers (including Plaintiff's family and the Decedent) that the Excursion Entities would not provide look-outs and/or lifeguards for the subject excursion;

    d.   Failure to adequately warn passengers (including Plaintiff's family and the Decedent) that the Excursion Entities would not provide functional life vests;

    e.   Failure to adequately warn passengers (including Plaintiff's family and the Decedent) that the Excursion Entities would not carry individuals trained in CPR or an AED on scene in the event of an emergency;

    f.   Failure to adequately warn and/or communicate to passengers (including the Plaintiff and the Decedent) that Carnival does not verify that the subject excursion and/or the equipment used for the excursion is/are reasonably safe and/or inspected, despite the subject excursion being promoted as "hand selected" by Carnival;

    g.   Failure to adequately warn and/or communicate to passengers (including the Plaintiff and the Decedent) that the Excursion Entities carry independent insurance from the cruise line that has lower limits and more limited coverage than Carnival's insurance;

    h.   Failure to adequately warn and/or communicate to passengers (including the Plaintiff) the limits of the Excursion Entities' insurance.

116.    The above acts and/or omissions caused and/or contributed to Ronald Fitch's death and the living Plaintiff's injuries while participating in the subject excursion because Plaintiff and the Decedent would not have purchased tickets for and/or participated in the subject excursion had the Excursion Entities and/or its agents, servants, and/or employees adequately warned and/or communicated the foregoing to them.

117.    As a direct result of the foregoing dangerous conditions to which the Decedent was exposed: Ronald Fitch suffered pre-death pain and suffering and died, and Plaintiff seeks recovery for such damages herein; and as further result, his Estate, family, survivors and/or beneficiaries incurred, as a result of his death, medical and/or body transportation expenses, funeral expenses, lost Ronald Fitch's financial contributions, lost Ronald Fitch's household support and services; and lost, among other available category of damages, Ronald Fitch's love, guidance and companionship; and suffered their own mental pain and suffering.

**WHEREFORE**, the Plaintiff demands damages, on behalf of the Decedent and all of the Decedent's heirs, survivors and beneficiaries, as allowed under the applicable state law and/or

USVI wrongful death statute(s) and/or survival act(s), including, but not limited to, loss of support, past and future earnings, loss of services, pain and suffering, and funeral expenses. In addition, or in the alternative, the Plaintiff demands all damages recoverable under General Maritime Law and/or applicable state law. The Plaintiff further demands trial by jury.

## COUNT VIII – NEGLIGENCE AGAINST DEFENDANTS
## BASED ON APPARENT AGENCY OR AGENCY BY ESTOPPEL

The Plaintiff re-alleges, adopts, and incorporate by reference the allegations in paragraphs one (1) through seventy-one (71) as though alleged originally herein.

118.    At all times material hereto, the Excursion Entities were the apparent agent(s) of Carnival.

119.    At all times material hereto, Carnival is estopped to deny that the Excursion Entities were their agent(s) or employee(s).

120.    At all times material hereto, Carnival made manifestations which caused the Plaintiff to believe that the Excursion Entities had authority to act for the benefit of Carnival. These manifestations included:

   a.  Carnival allowed its name to be utilized in connection with the advertising of the Excursion Entities;

   b.  Carnival made all arrangements for the subject excursion without effectively disclosing to the Plaintiff that the subject excursion was being run by another entity (and/or entities);

   c.  Carnival marketed the subject excursion using its company logo on its website and/or in its brochures and/or on its ship without effectively disclosing to the Plaintiff that the subject excursion was being run by another entity (and/or entities);

   d.  Carnival maintained an excursion desk on its ship whereby it offered, sold, provided information to, and answered questions of passengers, including Plaintiff, about the subject excursion without effectively disclosing to the Plaintiff that the subject excursion was being run by another entity (and/or entities);

e. Until the point that Plaintiff actually participated in the subject excursion, the Plaintiff' exclusive contacts concerning the subject excursion were with Carnival;

f. Carnival recommended to Plaintiff to not engage in excursions, tours or activities that are not sold through Carnival as Carnival has no familiarity with other tours or their operations;

g. The fee for the excursion was charged to the Plaintiff, and collected from the Plaintiff, exclusively by Carnival; and/or

h. Plaintiff received the receipt for the purchase of the subject excursion exclusively from Carnival.

121.    Plaintiff's family and the Decedent reasonably relied on the above, to their detriment, so as to believe that the Excursion Entities were the employee(s) and/or agent(s) of Carnival in choosing the subject excursion.

122.    It was reasonable for Plaintiff's family and the Decedent to believe that the Excursion Entities were Carnival's employee(s) and/or agent(s) because the Plaintiff's family and the Decedent booked, paid for and made all necessary arrangements for the subject excursion with Carnival. Carnival's actions caused Plaintiff's family and the Decedent to believe that the Excursion Entities had authority to act on Carnival's behalf. At no time did the Excursion Entities represent to the ship's passengers or the Plaintiff's family and the Decedent in particular in a meaningful way that the Excursion Entities were not agents or employees of Carnival.

123.    Plaintiff's family and the Decedent's reasonable reliance was detrimental because Plaintiff's family and the Decedent would not have booked, paid for and/or participated in the subject excursion or incur any injuries had the Plaintiff known that the subject excursion was not operated by Carnival.

124.    The foregoing acts of negligence of Carnival and/or the Excursion Entities were a direct and proximate cause of Ronald Fitch's death and the living Plaintiff's injuries.

125.    As a direct result of the foregoing dangerous conditions to which the Decedent was exposed: Ronald Fitch suffered pre-death pain and suffering and died, and Plaintiff seeks recovery

for such damages herein; and as further result, his Estate, family, survivors and/or beneficiaries incurred, as a result of his death, medical and/or body transportation expenses, funeral expenses, lost Ronald Fitch's financial contributions, lost Ronald Fitch's household support and services; and lost, among other available category of damages, Ronald Fitch's love, guidance and companionship; and suffered their own mental pain and suffering.

**WHEREFORE**, the Plaintiff demands damages, on behalf of the Decedent and all of the Decedent's heirs, survivors and beneficiaries, as allowed under the applicable state law and/or USVI wrongful death statute(s) and/or survival act(s), including, but not limited to, loss of support, past and future earnings, loss of services, pain and suffering, and funeral expenses. In addition, or in the alternative, the Plaintiff demands all damages recoverable under General Maritime Law and/or applicable state law. The Plaintiff further demands trial by jury.

## COUNT IX – NEGLIGENCE AGAINST DEFENDANTS BASED ON JOINT VENTURE BETWEEN CARNIVAL AND THE EXCURSION ENTITIES

The Plaintiff re-alleges, adopts, and incorporate by reference the allegations in paragraphs one (1) through seventy-one (71) as though alleged originally herein.

126.    At all times material hereto, Carnival and the Excursion Entities engaged in a joint venture to provide excursions to passengers aboard Carnival's ship(s).

127.    At all times material hereto, Carnival and the Excursion Entities entered into an agreement where Carnival would sell the subject excursion to its passengers and the Excursion Entities would operate the subject excursion.

128.    As its part of the joint venture, Carnival arranged for, sponsored, recommended, marketed, operated, marketed, sold and/or collected money for the subject excursion, and the money was then shared between Carnival and the Excursion Entities.  As its part of the joint venture, the Excursion Entities provided labor and/or operated the subject excursion.

129.    Carnival, on behalf of the joint venture, charged a fee to passengers who utilized the excursions.  The fee paid by the passengers, including the Plaintiff, was split between Carnival and the Excursion Entities, such that Carnival and the Excursion Entities shared a profit of the money made from the shore excursion.

130.    At all times material hereto, Carnival and the Excursion Entities had joint and/or shared control over aspects of the joint venture.  The Excursion Entities had control over the day-to-day workings of the excursions. Carnival also had control over the day-to-day workings of the excursions in that they required the Excursion Entities to exercise reasonable care in the operation of the subject excursion. Carnival had control over the arrangements, marketing and sales of the excursion.

131.    At all times material hereto, Carnival and the Excursion Entities shared a common purpose: to operate the subject excursion for a profit.

132.    At all times material hereto, Carnival and the Excursion Entities had a joint proprietary and/or ownership interest in the subject excursion. Carnival had an interest in arranging, sponsoring, recommending, advertising, operating, and selling the subject excursion as well as collecting money for such excursion, and the Excursion Entities had a proprietary interest in the time and labor expended in operating the subject excursion.

133.    At all times material hereto, Carnival and the Excursion Entities shared and/or had the right to share in the profits of the subject excursion, as Carnival retained a portion of the ticket sales for the subject excursion after the tickets were sold, and Carnival paid the Excursion Entities the remaining portion of the ticket sales for the subject excursion.

134.    At all times material hereto, Carnival and the Excursion Entities shared and/or had a duty to share any losses that may have been sustained with the subject excursion, including, for

instance, when Carnival issued a refund to passengers for the Excursion Entities' excursion(s), including, but not limited to, the subject excursion.

135.    Carnival and the Excursion Entities are jointly and severally responsible for each other's negligence as partners of the partnership and/or joint venture.

136.    At all times material hereto, Carnival and the Excursion Entities therefore:

    a.    Had an intention to create a joint venture;

    b.    Had a joint proprietary interest in the subject matter of the venture;

    c.    Had mutual control and/or joint control over the subject matter of the venture with respect to the provision of excursions to passengers aboard the ship;

    d.    Had a right to share in the profits of the joint venture; and

    e.    Would share losses which may have been sustained.

137.    As joint venturers, Carnival and the Excursion Entities are liable for each other's negligence.  As a result, Carnival is liable for the negligent conduct of the Excursion Entities.

138.    As a direct result of the foregoing dangerous conditions to which the Decedent was exposed: Ronald Fitch suffered pre-death pain and suffering and died, and Plaintiff seeks recovery for such damages herein; and as further result, his Estate, family, survivors and/or beneficiaries incurred, as a result of his death, medical and/or body transportation expenses, funeral expenses, lost Ronald Fitch's financial contributions, lost Ronald Fitch's household support and services; and lost, among other available category of damages, Ronald Fitch's love, guidance and companionship; and suffered their own mental pain and suffering.

**WHEREFORE**, the Plaintiff demands damages, on behalf of the Decedent and all of the Decedent's heirs, survivors and beneficiaries, as allowed under the applicable state law and/or USVI wrongful death statute(s) and/or survival act(s), including, but not limited to, loss of support, past and future earnings, loss of services, pain and suffering, and funeral expenses. In addition, or

in the alternative, the Plaintiff demands all damages recoverable under General Maritime Law and/or applicable state law. The Plaintiff further demands trial by jury.

## COUNT X – THIRD-PARTY BENEFICIARY

The Plaintiff re-alleges, adopts, and incorporate by reference the allegations in paragraphs one (1) through seventy-one (71) as though alleged originally herein.

139.    Carnival and the Excursion Entities entered into a contract to provide the subject excursion for passengers aboard Carnival's ship(s).

140. Carnival and the Excursion Entities intended that the contract primarily and directly benefit Carnival's passengers, including the Plaintiff and the Decedent.

141. The intent of Carnival and the Excursion Entities for the contract to benefit Carnival passengers, including the Plaintiff and the Decedent, was expressed by Carnival and the Excursion Entities.

142. The intent of Carnival and the Excursion Entities for the contract to benefit Carnival passengers, including the Plaintiff and the Decedent, was demonstrated by the provisions of the contract.  These provisions include, but are not limited to, the following: (a) the purpose of the agreement explicitly stating that it is for the Excursion Entities to provide shore excursions to guests on Carnival's vessels; (b) prohibiting dangerous activities from forming any part of shore excursions; (c) Carnival having the right to charge its passengers the price that Carnival determines in its sole discretion; (d) Carnival having the sole discretion to provide its passengers a full or partial reimbursement of the excursion ticket if a passenger is dissatisfied; (e) Carnival requiring that the Excursion Entities exercise reasonable care for the passengers' safety at all times; (f) Carnival requiring that the Excursion Entities satisfy and continue to satisfy the highest standards

of quality in the industry; and/or (g) Carnival requiring that the Excursion Entities maintain insurance for any and all injuries to passengers.

143. This contract was breached by Carnival and/or the Excursion Entities (and/or their agents, servants, joint venturers and/or employees) by failing to offer a reasonably safe excursion that satisfied the highest standards of quality in the industry (as required under the contract), based on the hazards involved with the subject excursion, including, but not limited to: i) the strong current at the swim site for the excursion; ii) the lack of look-outs and/or lifeguards provided by Carnival and/or the Excursion Entities for the subject excursion; iii) the lack of functional life vests provided by Carnival and/or the Excursion Entities; and iv) the poor or completely absent emergency response plan promulgated by Carnival and/or the Excursion Entities. Ronald Fitch would not have died and Plaintiff's family would not have been injured but for Defendants failing to provide a reasonably safe excursion that satisfied the highest standards of quality in the industry (as required under the contract).

144. As a direct result of the foregoing dangerous conditions to which the Decedent was exposed: Ronald Fitch suffered pre-death pain and suffering and died, and Plaintiff seeks recovery for such damages herein; and as further result, his Estate, family, survivors and/or beneficiaries incurred, as a result of his death, medical and/or body transportation expenses, funeral expenses, lost Ronald Fitch's financial contributions, lost Ronald Fitch's household support and services; and lost, among other available category of damages, Ronald Fitch's love, guidance and companionship; and suffered their own mental pain and suffering.

**WHEREFORE**, the Plaintiff demands damages, on behalf of the Decedent and all of the Decedent's heirs, survivors and beneficiaries, as allowed under the applicable USVI wrongful death statute and/or survival act, including, but not limited to, loss of support, past and future earnings, loss of services, pain and suffering, and funeral expenses. In addition, or in the

alternative, the Plaintiff demands all damages recoverable under General Maritime Law and/or applicable state law. The Plaintiff further demands trial by jury.

### COUNT XI – WRONGFUL DEATH CLAIM BROUGHT AGAINST DEFENDANTS PURSUANT TO INDIANA STATE LAW (IND. CODE 34-23-1-1), U.S.VIRGIN ISLANDS (5 V.I.C. § 76) AND/OR APPLICABLE STATE LAW

The Plaintiff re-alleges, adopts, and incorporate by reference the allegations in paragraphs one (1) through seventy-one (71) as though alleged originally herein.

145.    At all times material hereto, it was the duty of the Defendants to provide the Decedent with reasonable or ordinary care under the circumstances.

146.    On or about February 16, 2023, Defendants and/or their agents, servants, joint venturers and/or employees breached their duties to provide the Decedent with reasonable or ordinary care under the circumstances, based on the following acts and/or omissions:

    a. Failure to provide a reasonably safe excursion;

    b. Failure to recognize the strong current at the swim area and either cancel the excursion or modify it to remedy the danger;

    c. Failure to provide look-outs and/or lifeguards for the subject excursion;

    d. Failure to provide functional life vests for the subject excursion;

    e. Failure to provide reasonable snorkel and/ow swim instructions;

    f. Promoting the subject excursion as "hand selected" by Carnival, thereby implying the excursion's vessel(s) and/or operations were reasonably safe under the circumstances, when in fact they were not;

    g. Censoring, altering and/or deleting comments on publicly available website(s) operated and/or controlled by Carnival so as to censor, alter and/or delete complaints or information concerning safety concerns and prior incidents similar to the subject incident, thereby implying that the subject excursion, the Excursion Entities and/or their operations were reasonably safe under the circumstances, when in fact they were not;

    h. Failure to adequately inspect and/or monitor excursion providers so as to ensure that the subject excursion was reasonably safe for passengers;

    i.    Failure to regularly and/or adequately identify the highest safety standards in the industry for the activities offered in the subject excursion, and verify that the Excursion Entities are adhering to such standards; and/or

    j.    Failure to regularly and/or adequately review the safety record of the Excursion Entities before recommending the subject excursion to passengers and the Plaintiff.

147.    All or some of the above acts and/or omissions by Carnival and/or its agents, servants, and/or employees, caused and/or contributed to Ronald Fitch's death and the living Plaintiffs' injuries while participating in the subject excursion.

148.    At all times material hereto, Carnival and the Excursion Entities knew of the foregoing conditions causing the subject incident and did not correct them, or the conditions existed for a sufficient length of time so that Carnival, in the exercise of reasonable care under the circumstances, should have learned of them and corrected them.  This knowledge was or should have been acquired through: (a) Carnival's initial approval process of the Excursion Entities and/or the excursion, including, but not limited to, having Carnival's representative(s) take the excursion under the same or similar circumstances as the subject incident, as alleged in paragraphs 33-35 and 57-69; (b) Carnival's yearly inspections of the Excursion Entities and/or the excursion, including, but not limited to, conducting site inspections under the same or similar circumstances as the subject incident, as alleged in paragraphs 33-35 and 57-69; and/or (c) prior incidents involving Carnival passengers who drowned while participating in ocean water excursions, as alleged at paragraphs 57-59. *See e.g. Pucci v. Carnival Corp. and Cruise Ship Excursions Inc*., 146 F. Supp. 3d 1281 (S.D. Fla. 2015).

149.    As a direct result of the foregoing dangerous conditions to which the Decedent was exposed: Ronald Fitch suffered pre-death pain and suffering and died, and Plaintiff seeks recovery for such damages herein; and as further result, his Estate, family, survivors and/or beneficiaries incurred, as a result of his death, medical and/or body transportation expenses, funeral expenses,

lost Ronald Fitch's financial contributions, lost Ronald Fitch's household support and services; and lost, among other available category of damages, Ronald Fitch's love, guidance and companionship; and suffered their own mental pain and suffering.

**WHEREFORE**, the Plaintiff demands damages, on behalf of the Decedent and all of the Decedent's heirs, survivors and beneficiaries, as allowed under the applicable state law and/or USVI wrongful death statute(s) and/or survival act(s), including, but not limited to, loss of support, past and future earnings, loss of services, pain and suffering, and funeral expenses. In addition, or in the alternative, the Plaintiff demands all damages recoverable under General Maritime Law and/or applicable state law. The Plaintiff further demands trial by jury.

## COUNT XII – *QUASI IN REM* "MARITIME RULE B" ATTACHMENT AND GARNISHMENT AGAINST CRUISE EXCURSIONS INC.

The Plaintiff re-alleges, adopts, and incorporate by reference the allegations in paragraphs one (1) through seventy-one (71) as though alleged originally herein.

150.    This Count XII is brought in the alternative and in the event this Court finds that it does not have personal jurisdiction over Defendant, CSE.

151.    This claim falls within the Court's admiralty and maritime subject matter jurisdiction, as it is a claim that arises from injuries to passengers during a cruise on navigable waters. *See Ash v. Royal Caribbean Cruises Ltd.*, 13-20619-CIV-Goodman, 2014 WL 2480612 (S.D. Fla. June 3, 2014) (finding that admiralty jurisdiction existed for cruise passengers' Rule B claim against a land-based shore excursion operator providing transportation for cruise passengers to and from an excursion).

152.    The Plaintiff files this Complaint and respectfully requests that this Honorable Court attach and/or garnish the belongings of Defendant, CSE that are in the possession of Garnishees, CARNIVAL CORPORATION, ROYAL CARIBBEAN CRUISES LTD. d/b/a

ROYAL CARIBBEAN GROUP, and/or CELEBRITY CRUISES INC., presently within this District.

153. Rule B of the Supplemental Rules for Admiralty and Maritime Claims of the Federal Rules of Civil Procedure expressly states that "[i]f a defendant is not found within the district when a verified complaint praying for attachment and the affidavit required by Rule B(1)(b) are filed, a verified complaint may contain a prayer for process to attach the defendant's tangible or intangible personal property--up to the amount sued for--in the hands of garnishees named in the process." FRCP SUPP AMC Rule B(1)(a).

154. In the alternative, Defendant CSE cannot be found within the Southern District of Florida, as it operates its business in U.S.V.I.

155. CSE's belongings located within this judicial district are the past, present and future earnings from their Tour Operator and/or Shore Excursion Agreement(s), and/or any other agreements with Garnishees, CARNIVAL CORPORATION, ROYAL CARIBBEAN CRUISES LTD. d/b/a ROYAL CARIBBEAN GROUP, NCL (BAHAMAS) LTD. and/or CELEBRITY CRUISES INC. This includes, but is not limited to, all moneys owing under the aforementioned agreements from the Garnishees (directly or indirectly from any of the Garnishees' entities, affiliates and/or agents) to CSE, and/or any person and/or entity acting as agent and/or collecting moneys for CSE.

156. The amount of damages sought in this action, including unliquidated damages and attorneys' fees in this action, is an amount in excess of $1,000,000.00 United States Dollars.

**WHEREFORE**, the Plaintiff demands for process to attach CSE's tangible or intangible personal property, up to the amount sued for, in the hands of the Garnishees named in the process, to satisfy the claims of Plaintiff, on behalf of the Decedent's Estate and survivors.

Dated: December 6, 2023

Respectfully submitted,

LIPCON, MARGULIES,
& WINKLEMAN, P.A.
*Attorneys for Plaintiff*
2800 Ponce de Leon Blvd.
Suite 1480
Coral Gables, FL 33134
Telephone: (305) 373-3016
Facsimile: (305) 373-6204

By: */s/ L. Alex Perez*
**JASON R. MARGULIES**
Florida Bar No. 57916
jmargulies@lipcon.com
**L. ALEX PEREZ**
Florida Bar No. 125452
aperez@lipcon.com